Mountain Valley Pipeline, LLC
v. Daniel Guidry and Ashley Stecher Wagner

EXHIBIT 1

To Complaint

United States Department of Agriculture, United States Forest Service
Record of Decision

Forest Service
U.S. DEPARTMENT OF AGRICULTURE

Southern Region | Jefferson National Forest | R8-MB 168 | May 2023

# Record of Decision

## Mountain Valley Pipeline and Equitrans Expansion Project



In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD-3027, found online at http://www.ascr.usda.gov/complaint_filing_cust.html and at any USDA office or write a letter addressed to USDA and provide in the letter all of the information requested in the form. To request a copy of the complaint form, call (866) 632-9992. Submit your completed form or letter to USDA by: (1) mail: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, SW, Washington, D.C. 20250-9410; (2) fax: (202) 690-7442; or (3) email: program.intake@usda.gov.

USDA is an equal opportunity provider, employer and lender.

# Record of Decision
## for the
## Mountain Valley Pipeline and Equitrans Expansion Project[1]

### Monroe County, West Virginia and Giles and Montgomery Counties, Virginia

| | |
|---|---|
| **Lead Agency:** | **USDA Forest Service** |
| **Cooperating Agency:** | **USDOI Bureau of Land Management** |
| **Responsible Official:** | **Dr. Homer Wilkes, Under Secretary<br>U.S. Department of Agriculture<br>Natural Resources and Environment<br>Washington D.C.** |
| **For Information Contact:** | **Joby Timm, Forest Supervisor<br>George Washington and Jefferson National Forests<br>1-888-603-0261** |

[1] The Equitrans Expansion portion of the larger Mountain Valley Pipeline project does not impact National Forest System lands, and therefore this document has no bearing on the Equitrans Expansion Project.

# Table of Contents

1 Introduction and Background ........ 1
2 Decision of Under Secretary for this Project ........ 3
2.1 Adoption of 2017 FERC FEIS and 2021 FERC Boring EA ........ 3
2.2 Approval of Forest Plan Amendment ........ 4
2.3 Concurrence with BLM and Inclusion of Terms and Conditions ........ 5
3 Decision Framework and Rationale ........ 7
3.1 Purpose of and Need for Action/Decision ........ 7
3.2 Key Information which Framed this Decision ........ 8
3.3 Alternatives Considered ........ 17
3.4 Public Involvement Which Informed This Decision ........ 21
3.5 Use of Best Available Scientific Information (36 CFR § 219.3) ........ 22
4 Other Context Which Informs the Decision ........ 23
4.1 Changes to Resource Conditions ........ 23
4.2 Organic Act, Multiple-Use Sustained Yield Act, and National Energy Policy ........ 24
5 Findings Required by Other Laws, Regulations, and Policies ........ 24
5.1 National Forest Management Act (NFMA) ........ 24
5.2 National Environmental Policy Act (NEPA) ........ 25
5.3 National Historic Preservation Act (NHPA) ........ 25
5.4 National Trails System Act (NTSA) ........ 26
5.5 Clean Water Act ........ 26
5.6 Roadless Area Conservation Rule ........ 27
5.7 Endangered Species Act (ESA) ........ 27
5.8 Special Status Species ........ 28
5.9 Regional Forester Sensitive Species (RFSS) ........ 28
6 Administrative Review ........ 29
7 Decision Implementation Date ........ 29
8 Contact Person ........ 29

**List of Tables**

Table 1. Summary of Plan Amendment by Standard to be Modified/Added Standard. ........ 13
Table 2. NFS Lands Required for MVP Construction, Operation, and Maintenance ........ 18
Table 3. Comparison of Proposed Action and NFS Lands Avoidance Route ........ 20

**List of Figures**

Figure 1. Mountain Valley Pipeline Route on the Jefferson National Forest ........ 2

## Acronyms and Abbreviations

| Acronym or Abbreviation | Description |
|---|---|
| ACP | Atlantic Coast Pipeline |
| ANST | Appalachian National Scenic Trail |
| BA | Biological Assessment |
| BLM | Bureau of Land Management |
| BE | Biological Evaluation |
| 2021 FERC Boring EA | Mountain Valley Pipeline Amendment Project Environmental Assessment produced by FERC in August 2021 |
| BO | Biological Opinion |
| CEQ | Council on Environmental Quality |
| Certificate | Order Issuing Certificates and Granting Abandonment Authority |
| CFR | Code of Federal Regulations |
| CWA | Clean Water Act |
| DSEIS | Draft Supplemental Environmental Impact Statement |
| 2020 DSEIS | Draft Supplemental Environmental Impact Statement published by USFS in September 2020 |
| 2022 DSEIS | Draft Supplemental Environmental Impact Statement published by USFS in December 2022 |
| ECD | Erosion Control Device |
| EIS | Environmental Impact Statement |
| EO | Executive Order |
| ESA | Endangered Species Act |
| FEIS | Final Environmental Impact Statement |
| 2017 FERC FEIS | Final Environmental Impact Statement published by FERC in 2017 |
| FERC | Federal Energy Regulatory Commission |
| Forest Plan | 2004 Jefferson National Forest Revised Land and Resource Management Plan |
| Fourth Circuit | United States Court of Appeals for the Fourth Circuit |
| FR | Federal Register |
| FSEIS | Final Supplemental Environmental Impact Statement |
| 2020 FSEIS | Final Environmental Impact Statement published by USFS in December 2020 |
| 2023 FSEIS | Final Environmental Impact Statement published by USFS in April 2023 |
| FSH | Forest Service Handbook |
| FSM | Forest Service Manual |
| FW | Forest Wide |
| FWS | United States Fish and Wildlife Service |
| JNF | Jefferson National Forest |
| LRMP | Land and Resource Management Plan |

| | |
|---|---|
| MLA | Mineral Leasing Act |
| Mountain Valley | Mountain Valley Pipeline, LLC |
| MVP | Mountain Valley Pipeline |
| NEPA | National Environmental Policy Act |
| NFMA | National Forest Management Act |
| NFS | National Forest System |
| NHPA | National Historic Preservation Act |
| NTSA | National Trails System Act |
| NOI | Notice of Intent |
| NPDES | National Pollution Discharge Elimination System |
| NPS | National Park Service |
| NRHP | National Register of Historic Places |
| PA | Programmatic Agreement |
| POD | Plan of Development |
| RFSS | Regional Forester Sensitive Species |
| PHSMA | Pipeline and Hazardous Materials Safety Administration |
| ROD | Record of Decision |
| 2017 USFS ROD | Record of Decision published by USFS in December 2017 |
| 2021 USFS ROD | Record of Decision published by USFS in January 2021 |
| ROW | Right-of-way |
| RUSLE2 | Revised Universal Soil Loss Equation, Version 2 |
| SBA | Supplement to the Biological Assessment |
| SBE | Supplemental Biological Evaluation |
| SEIS | Supplemental Environmental Impact Statement |
| SF | Standard Form |
| SHPO | State Historic Preservation Office |
| TES | Threatened, Endangered, or Sensitive |
| The Court | United States Court of Appeals for the Fourth Circuit |
| TUP | Temporary Use Permit |
| U.S. | United States |
| US ACE | United States Army Corps of Engineers |
| USDA | United States Department of Agriculture |
| USFS or Forest Service | United States Forest Service |
| U.S.C. | United States Code |
| VDEQ | Virginia Department of Environmental Quality |
| WOTUS | Waters of the United States |
| WVDEP | West Virginia Department of Environmental Protection |

# 1 Introduction and Background

The Mountain Valley Pipeline (MVP) is a proposed 303.5-mile interstate natural gas pipeline that would cross about 3.5 miles of the Jefferson National Forest (JNF), in Monroe County (West Virginia), Giles County (Virginia), and Montgomery County (Virginia) (Figure 1). The pipeline route crosses the Appalachian National Scenic Trail (ANST) and the Brush Mountain Inventoried Roadless Area. As proposed, the construction phase of the MVP will require use of about 54 acres of the JNF, and the operational phase will occupy about 22 acres of the JNF.

The Federal Energy Regulatory Commission (FERC) regulates interstate transportation of natural gas per the Natural Gas Act of 1938 (as amended) and therefore is the lead Federal agency for the coordination of all applicable Federal authorizations associated with the larger MVP project.

The Mineral Leasing Act (30 United States Code [U.S.C.] § 185 et seq.) (MLA) authorizes the use of certain Federal lands for pipeline rights-of-way. Because the proposed MVP would cross lands administered by two different Federal agencies (U.S. Army Corps of Engineers and U.S. Forest Service), the Secretary of the Interior is authorized to issue the rights-of-way for occupancy of involved Federal lands after consultation with those Federal agencies. The Secretary of the Interior has delegated to the Bureau of Land Management (BLM) the authority under the MLA to issue the rights-of-way. The BLM has responsibility for reviewing the proponent's ROW (right-of-way) application and authority to issue a decision on whether to approve, approve with modifications, or deny the application.

The BLM is required to obtain the concurrence of the Forest Service before the BLM may issue the right-of-way grant across National Forest System (NFS) lands. The BLM decision for the ROW grant across Federal lands would be documented in a Record of Decision (ROD) issued by the BLM. Additionally, if the BLM decides to issue a ROW, the BLM would issue a temporary use permit (TUP) in association with the ROW authorizing the use of temporary workspace outside of the authorized ROW that is needed for ancillary construction needs on the JNF during the construction phase and other activities associated with implementation. This TUP authorization on NFS lands also requires Forest Service concurrence with terms to be submitted to the BLM for inclusion in the ROW grant. Forest Service concurrence would be needed for the temporary use during construction and for the BLM's issuance of the 30-year ROW grant. Construction, operation, and maintenance actions that need terms and Forest Service concurrence include:

- The use of a 125-foot-wide temporary construction ROW (54 acres) for pipeline installation and trench spoil2. Once construction is complete, the MVP would retain a 50-foot-wide3 authorized ROW (22 acres) to operate the pipeline.
- Construction of a 42-inch diameter pipeline across 3.5 miles of the JNF.
- Installation of surface pipeline markers to advise the public of pipeline presence and cathodic pipeline protection test stations that are required by Department of Transportation (DOT).

[2] A TUP authorizes use of the temporary construction ROW. The temporary ROW at waterbody crossings and riparian buffer areas is 75 feet wide.
[3] The width of the authorized ROW is 50 feet (including the ground occupied by the pipeline).

As a Federal agency that administers lands which would be crossed by the MVP, the Forest Service's decision to be made is:

- Whether to adopt all or portions of the 2017 FERC FEIS and all or portions of the 2021 FERC Boring Environmental Assessment (EA) that are relevant to NFS lands,
- Whether to approve a project-specific Forest Plan amendment that would modify 11 standards and add one new standard in the Forest Plan,
- Whether to concur with the grant of a ROW, and
- What terms and conditions should be included with the Forest Service concurrence for the Project.

For this decision, the USDA Under Secretary is the Forest Service's responsible official (7 CFR § 2.12). This ROD documents the decision and rationale of the USDA Under Secretary (40 CFR § 1505.2)[4]. The decision and rationale of the Under Secretary is based upon and supported by the April 2023 Final Supplemental Environmental Impact Statement (2023 FSEIS)[5] and the previous December 2020 Final Supplemental Environmental Impact Statement (2020 FSEIS)[6], both prepared by the USDA Forest Service (Forest Service), as well as the adoption (40 CFR § 1506.3) of relevant portions of the June 2017 Final Environmental Impact Statement (2017 FERC FEIS) and relevant portions of the adoption of the August 2021 FERC Boring EA, both prepared by the FERC for the Mountain Valley Pipeline and Equitrans Expansion Project**.**

**Figure 1. Mountain Valley Pipeline Route on the Jefferson National Forest**

[4] On April 20, 2022, the Council of Environmental Quality published its final rule amending certain provisions of its regulations for implementing the NEPA (see 87 FR 23453, pages 23453 to 23470) in the *Federal Register* (FR). The effective date for the revised regulations was May 20, 2022. Because this project was initiated in 2017, the Forest Service has elected to continue using the previous NEPA regulations, issued in 1978, as amended in 1986 and 2005.

[5] In this ROD, all references to the 2023 FSEIS incorporate minor typographical corrections that are disclosed in an Errata list published on May 12, 2023 at https://www.fs.usda.gov/project/?project=50036.

[6] In this ROD, all references to the 2020 FSEIS incorporate minor typographical corrections that are disclosed in an Errata list published on January 11, 2021 at https://www.fs.usda.gov/project/?project=50036.




# 2 Decision of Under Secretary for this Project

The USDA Under Secretary has considered the environmental analysis disclosed in the 2023 FSEIS, the 2020 FSEIS, the 2017 FERC FEIS, the 2021 FERC Boring EA, the project record, the proponent's Plan of Development (POD), and comments from the public on the 2020 and 2022 DSEIS's, from partners, tribal governments, and from other Federal and state agencies. After consideration of Alternatives 1 and 2 as disclosed in the 2023 FSEIS, the USDA Under Secretary has decided to select Alternative 2 as described in the 2023 FSEIS, thereby deciding to:

- Adopt portions of the 2017 FERC FEIS and adopt portions of the 2021 FERC Boring EA that are relevant to NFS lands (see 2.1 of this ROD).
- Approve a project-specific Forest Plan amendment that will modify 11 standards and add one new standard in the Forest Plan (see 2.2 of this ROD).
- Concur with the grant of a ROW (see 2.3 of this ROD).
- Provide terms and conditions to be included with the Forest Service concurrence for the project (see 2.3 of this ROD).

Details of the Under Secretary's decision are in the sections below.

## 2.1 Adoption of 2017 FERC FEIS and 2021 FERC Boring EA

The USFS was a cooperating agency during FERC's creation of the 2017 FERC FEIS. As a cooperating agency and after an independent review of the 2017 FERC FEIS, the USDA Under Secretary is deciding for the USFS to adopt portions of the 2017 FERC FEIS which are relevant to NFS lands. After an independent review of the 2021 FERC Boring EA, the USDA Under Secretary is also deciding for the

USFS to adopt portions of the FERC Boring EA which are pertinent to NFS lands. The USFS has supplemented each with additional analysis disclosed in the 2023 FSEIS and 2020 FSEIS.

The USDA Under Secretary has relied on the 2017 FERC FEIS, the 2020 FSEIS, the 2021 FERC Boring EA, and the 2023 FSEIS to inform the Forest Service's final decision and to certify that the Forest Service considered all of the alternatives and analyses submitted by State, Tribal, and local governments and public commenters (40 CFR §§ 1503.3 and 1503.4). In addition, the 2023 FSEIS incorporates by reference the project records for the 2017 FERC FEIS and the 2020 FSEIS.

## 2.2 Approval of Forest Plan Amendment

The USDA Under Secretary is deciding to amend the JNF Forest Plan. The project-specific plan amendment modifies eleven Forest Plan standards for the following five parts: Utility Corridors; Soil and Riparian; Old Growth Management Area; Appalachian National Scenic Trail Area; and Scenic Integrity Objectives. The project-specific plan amendment also adds one MVP-Specific plan standard to ensure the directly related substantive requirements are applied. This new Forest Plan standard will formalize affirmative requirements and restrictions on the implementation of MVP (2023 FSEIS Section 2.2.2.1 and Appendix A) while minimizing environmental impacts to soils, water, riparian areas, the ANST, and scenery resources (2023 FSEIS Section 3.3.4.2 and Appendix A). Resource protection for each of the directly related substantive requirements is provided through the protective intent of each selected POD Appendix, and not each individual action listed in any appendix.

Plan language that is new or modified as a result of this decision appears in *italicized* text below. The areas affected by this decision include approximately 54 acres of NFS lands associated with the about 3.5-mile pipeline corridor for the MVP Project which crosses the Jefferson National Forest. The Forest Plan amendment is project-specific and is effective from the date of this decision and continues through the construction and life of the project.

- **FW-5** (revegetation) - On all soils dedicated to growing vegetation, the organic layers, topsoil and root mat will be left in place over at least 85% of the activity area and revegetation is accomplished within 5 years, *with the exception of the MVP construction zone and right-of-way.*

- **FW-8** (soil compaction in water saturated areas) - To limit soil compaction, no heavy equipment is used on plastic soils when the water table is within 12 inches of the surface, or when soil moisture exceeds the plastic limit, *with the exception of the MVP construction zone and right-of-way.* Soil moisture exceeds the plastic limit when soil can be rolled to pencil size without breaking or crumbling.

- **FW-9** (soil effects from heavy equipment use) - Heavy equipment is operated so that soil indentations, ruts, or furrows are aligned on the contour and the slope of such indentations is 5% or less, *with the exception of the MVP construction zone and right-of-way.*

- **FW-13** (exposed soil) - Management activities expose no more than 10% mineral soil in the channeled ephemeral zone *with the exception of the MVP construction zone and right-of-way*.

- **FW-14** (residual basal area within the channeled ephemeral zone) - In channeled ephemeral zones, up to 50% of the basal area may be removed down to a minimum basal area of 50 square feet per acre. Removal of additional basal area is allowed on a case-by-case basis when needed to benefit riparian- dependent resources, *with the exception of the MVP construction zone and right-of-way*.

- **FW-184** (scenic integrity objectives) - The Forest Scenic Integrity Objectives (SIOs) Maps govern all new projects (including special uses), *with the exception of the MVP construction zone and right-of-way.* Assigned SIOs are consistent with Recreation Opportunity Spectrum management direction. Existing conditions may not currently meet the assigned SIO.

- **FW-248** (utility corridors) - Following evaluation of the above criteria, decisions for new authorizations outside of existing corridors and designated communication sites will include an amendment to the Forest Plan designating them as Prescription Area 5B or 5C, *with the exception of the MVP construction zone and right-of-way.*

- **4A-028** (Appalachian National Scenic Trail [ANST] and utility corridors) - Locate new public utilities and rights-of-way in areas of this management prescription area where major impacts already exist, *with the exception of the MVP construction zone and right-of- way*. Limit linear utilities and rights- of-way to a single crossing of the prescription area, per project.

- **6C-007** (tree clearing in the old growth management area) - Allow vegetation management activities to: maintain and restore dry-mesic oak forest, dry and xeric oak forest, dry and dry-mesic oak-pine old growth forest communities; restore, enhance, or mimic historic fire regimes; reduce fuel buildups; maintain rare communities and species dependent on disturbance; provide for public health and safety; improve threatened, endangered, sensitive, and locally rare species habitat; control non- native invasive vegetation, *with the exception of the MVP construction zone and right-of-way.*

- **6C-026** (utility corridors in the old growth management area) - These areas are unsuitable for designation of new utility corridors, utility rights-of-way, or communication sites, *with the exception of the MVP construction zone and right-of-way*. Existing uses are allowed to continue.

- **11-003** (exposed soil within the riparian corridor) - Management activities expose no more than 10% mineral soil within the Project area riparian corridor, *with the exception of the MVP construction zone and right-of-way*.

- **MVP-Specific Standard –** *To minimize environmental impacts to soils, water, riparian areas, the ANST, and scenery resources, adherence and implementation of the following MVP Plan of Development (POD) appendices must be followed during the construction and restoration phases of the Project: C-1 (West Virginia Erosion and Sediment Control Plan), C-2 (Virginia Erosion and Sediment Control Plan), E (Conventional Bore Contingency Plan for the Proposed Crossing of the Appalachian National Scenic Trail), H (Restoration Plan), M (Winter Construction Plan), and N (Environmental Compliance Management Plan)*

## 2.3 Concurrence with BLM and Inclusion of Terms and Conditions

The USDA Under Secretary has decided to authorize the Forest Service's concurrence with the BLM's granting of a ROW and TUP across NFS lands. As part of the Forest Service's Letter of Concurrence to the BLM, the following Terms and Conditions will apply to the construction, operation, and maintenance of the MVP.

1. Mountain Valley shall obtain and comply with the Right-Of-Way (ROW) Grant and Temporary Use Permits as approved by the BLM.

2. Mountain Valley must ensure that the Plan of Development (POD) is consistent with National Core BMP Technical Guide (FS-990a).

3. Mountain Valley must implement the construction procedures and mitigation measures that are applicable to NFS lands as disclosed in the POD and updates thereof which have been approved by the Forest Service. Any requests made by the company for activities on NFS lands not included in the approved POD must be requested through the variance process outlined in the POD Appendix N. Any significant, proposed change, including a change outside of the approved ROW grant or construction modification determined to be a substantial deviation, would require an amendment to the ROW grant that must be authorized by the BLM. Additional environmental analysis may be required as part of NEPA and NFMA. Any variances must be approved prior to the activity taking place (POD Appendix N [MVP 2022]).

4. Mountain Valley must adhere to the stream crossing contingency measures outlined in the 2021 FERC Boring EA when boring under the four streams on NFS lands.

5. Mountain Valley shall comply with applicable provisions of Appendix C – Environmental Conditions of the FERC Order Issuing Certificates and Granting Abandonment Authority; Docket Nos. CP16-10-000 and CP16-13-000 (issued October 13, 2017) and Order Granting Requests for Extension of Time (issued August 23, 2022); Dockets CP19-477-001, CP16-10-009, and CP21-57-001.

6. Mountain Valley shall obtain all State water permits and certifications applicable to NFS lands, before beginning activity on NFS lands, and must remain in compliance with Erosion and Sediment Controls Plans, as listed below:

   - Before beginning construction, Mountain Valley shall obtain and comply with required approvals/certifications for necessary Stormwater Permits from the Virginia Department of Environmental Quality and the West Virginia Department of Environmental Protection.

   - During and after construction on NFS land, Mountain Valley shall comply with the associated Erosion and Sediment Control Plan as approved by the Virginia Department of Environmental Quality and by the West Virginia Department of Environmental Protection.

7. Mountain Valley shall comply with the applicable Reasonable and Prudent Measures, and Terms and Conditions of the February 28, 2023 U.S. Fish and Wildlife Service (FWS) Biological Opinion for the MVP Project. Mountain Valley shall also implement applicable mitigation measures recommended by FWS through any future Section 7(a)(4) Endangered Species Act (ESA) conferencing for future species that may occur. If species are listed as threatened or endangered under the ESA, any Reasonable and Prudent Measures and Terms and Conditions identified in a Supplemental Biological Opinion conducted under ESA 7(a)(2) must be implemented by Mountain Valley.

8. Mountain Valley shall implement the Revised Historic Property Treatment Plan for the Appalachian National Scenic Trail (ANST) as outlined in the FERC's Programmatic Agreement (docket #CP16-10-000) and the POD's ANST Contingency Plan.

9. Mountain Valley is not authorized to use NFS roads for activities associated with this project, except where the Limit of Disturbance (LOD) is coincident with Mystery Ridge Road and with Brush Mountain Road.

10. Mountain Valley is not authorized to undertake activities related to construction on NFS lands until the company has obtained all Federal and State authorizations outstanding for the entire project. Changes to approved mitigation measures, construction procedures, and construction

work areas due to unforeseen or unavoidable site conditions will require regulatory approval from the applicable land management agencies.

# 3 Decision Framework and Rationale

Each of the sections below identify and discuss all factors, including essential considerations of national policy, that the USDA Under Secretary balanced in making the Decision (see Section 2 above). These sections also state how those considerations entered into the Decision (40 CFR § 1505.2(a)(2)), providing rationale and reasons for the Decision.

The sections below also demonstrate that the Forest Service has adopted all practicable means to avoid or minimize environmental harm from the alternative selected and the monitoring and enforcement program for any enforceable mitigation requirements or commitments is disclosed (40 CFR § 1505.2(c)).

## 3.1 Purpose of and Need for Action/Decision

The overall purpose of the MVP project is described in the 2017 FERC FEIS and is generally to transport natural gas produced in the Appalachian Basin to markets in the Northeast, Mid-Atlantic, and Southeastern United States. The purpose of the MVP project is found in more detail within the 2017 FERC FEIS, page 1-8. Despite the remand of the 2017 and 2021 USFS ROD's, the project's purpose articulated in the 2017 FERC FEIS remains valid.

The Forest Service's purpose and need for the project is narrower than that described in the 2017 FERC FEIS, because the agency's decisions are narrower and within the context of the FERC decision to issue a Certificate of Public Convenience and Necessity for the MVP project, which is still valid. The Forest Service's purpose and need for action is to respond to a proposal from Mountain Valley to construct and operate an underground 42-inch interstate natural gas pipeline that would cross NFS lands on the JNF along a proposed 3.5-mile corridor. A Forest Service decision is needed because the project as proposed would not be consistent with several Forest Plan standards relating to utility corridors, soil, riparian, old growth, the Appalachian National Scenic Trail (ANST), and scenic integrity without a project-specific amendment. Relatedly, there is a need to determine what terms and conditions, or stipulations, should be provided to the BLM for incorporation into the ROW grant in order to protect resources and the public interest consistent with the MLA (30 U.S.C. § 185(h)). In addition, there is a need for the Forest Service, at a minimum, to demonstrate that an independent review of the sedimentation analysis has occurred, that predicted effects are supported with rationale, and that previous concerns and comments related to erosion and its effects have been satisfied.

The BLM's purpose and need is to respond to Mountain Valley's amended MLA ROW application for the MVP project to construct and operate a natural gas pipeline across NFS lands consistent with the MLA, 30 U.S.C. § 185 and the BLM's implementing regulations, 43 CFR Part 2880. Under the MLA, the BLM has responsibility for reviewing Mountain Valley's ROW application and issuing a decision on whether to approve, approve with modifications, or deny the application.

Providing rationale for the Under Secretary's decision, selection of Alternative 2 as disclosed in the 2023 FSEIS meets the Forest Service's purpose and need for response to Mountain Valley's proposal. This Decision also fulfills the purpose and need to provide a project-specific Forest Plan amendment to allow the project's compliance with Forest Plan standards. See Section 2.2 above for a list of standards that will be modified in the Forest Plan amendment. Furthermore, this Decision will provide terms and conditions to the BLM for incorporation into the ROW and TUP grants. Lastly, this Decision certifies independent agency review of sedimentation analysis.

## 3.2 Key Information which Framed this Decision

In 2017, following the issuance of the Forest Service's and the BLM's now-vacated RODs, project implementation began in December and continued until July 27, 2018, when the United States Court of Appeals for the Fourth Circuit (Fourth Circuit or the Court) vacated and remanded both RODs [7].

To remedy the deficiencies found by the Court's 2018 remand, the Forest Service, in cooperation with the BLM, developed the 2020 FSEIS, which supplemented and does not replace the 2017 FERC FEIS. The 2020 FSEIS also considered whether there were any changed circumstances or new information having relevance to the environmental concerns and/or bearing on the proposed action or its effects.

The 2021 USFS ROD was subsequently published, but vacated by the Fourth Circuit Court in January 2022[8] with remand in part for the following deficiencies, referred to in this Decision as Key Issues: consideration of sedimentation and erosion real-world data related to the Project, compliance with the 2012 Planning Rule (36 CFR Part 219), and review of the conventional bore method to construct stream crossings.

On March 28, 2022, Mountain Valley submitted a revised MLA ROW application to the BLM, seeking to construct and operate the natural gas pipeline across the JNF. The BLM deemed the application complete on August 5, 2022 (43 CFR § 2884.11). Mountain Valley also requested that the Forest Service amend the Forest Plan consistent with the issues identified by the Court.

To remedy the most recent court-identified deficiencies, the USFS, in cooperation with the BLM, has published the 2023 FSEIS. The 2023 FSEIS includes information and disclosures which respond to the Fourth Circuit's remand by supplementing previous information and disclosures found in the 2017 FERC EIS and the 2020 FSEIS. The 2023 FSEIS focuses on relevant key issues that have not already been analyzed in the 2017 FERC FEIS or 2020 FSEIS and considers any changed circumstances or new information that is relevant to this project. (2023 FSEIS, Section 3.3)

The Under Secretary concludes that 2023 FSEIS and supporting documentation adequately address and respond to deficiencies and Key Issues raised by the Fourth Circuit, which are considered as part of this Decision (see Section 2 above). Namely, this Decision responds to the Key Issues of:

1) consideration of sedimentation and erosion real-world data related to the Project

2) compliance with the 2012 Planning Rule (36 CFR Part 219), and

3) review of the conventional bore method to construct stream crossings

The Under Secretary's rationale is detailed in the subsections below.

### Responsiveness to Key Issue – consideration of sedimentation and erosion real-world data related to the Project

In January 2022, the Fourth Circuit vacated the 2021 USFS ROD, finding its reliance on the 2020 FSEIS to have shortcomings in considerations of real-world data, specifically of existing U.S. Geological Survey

[7] Sierra Club, Inc. v. United States Forest Serv., 897 F.3d 582, 589 (4th Cir.), reh'g granted in part, 739 F. App'x 185 (4th Cir. 2018)
[8] Wild Virginia v. United States Forest Serv., 24 F.4th 915, 920 (4th Cir. 2022) ). The Fourth Circuit also vacated and remanded the BLM's decision approving the MLA ROW application.

monitoring near the project area.[9] The Court remanded the Forest Service's Decision in order "to consider USGS data and other relevant information indicating that the modeling used in the EIS may not be consistent with data about the actual impacts of the Pipeline and its construction." [10]

On remand, the USFS disclosed further analysis of real-world data, including existing USGS monitoring data.

As Section 3.3.2 of the 2023 SEIS discloses, resource specialists performed an independent agency review of real-world information and data that includes:

- USGS in-stream water quality monitoring station data (see also 2023 FSEIS, Appendix B and Appendix E)
- MVP sediment monitoring data
- Virginia Department of Environmental Quality (VDEQ) ROW monitoring and related reports
- West Virginia Department of Environmental Protection ROW monitoring and related reports (as disclosed in the 2023 FSEIS Appendix F – Response to Comments), and
- Transcon ROW monitoring reports.

The Forest Service also consulted other specialists, including those at the USGS, to confirm an understanding of the paired-station water quality sample design and objectives of the monitoring program (personal communication with USGS Virginia and West Virginia Science Center, October 2022).

The Forest Service and the BLM conducted a site visit in October 2022 to review each stream crossing on NFS lands and the Roanoke River in Lafayette, Virginia. A Professional Wetland Scientist also conducted a field visit in February 2023 to confirm the boundaries of riparian areas associated with each of the four proposed stream crossings on NFS lands. The Forest Service also reviewed data and information described in public comments on the 2020 DSEIS and 2022 DSEIS.

The analysis in the 2023 FSEIS (Section 3.3.2) demonstrates that the available relevant data, including the Forest Service and BLM's consideration of monitoring information from USGS data, MVP, VDEQ, and Transcon, are all consistent with the conclusion that the erosion control devices (ECDs), as modeled in Revised Universal Soil Loss Equation, Version 2 (RUSLE2), on the JNF continue to be effective in minimizing sediment yield from the pipeline ROW.

The Under Secretary's decision (see Section 2 above) is supported by the rationale that the 2023 FSEIS responds to the Court-identified deficiency by demonstrating that the Forest Service and the BLM have considered USGS data and other relevant information related to the modeling used in the 2020 FSEIS and the actual impacts of the pipeline and its construction, finding that quantitative data (i.e., USGS and MVP monitoring data) and inspection and monitoring reports (i.e., VDEQ, WVDEP, and Transcon) do not suggest that actual data are inconsistent with the modeling used in the 2020 FSEIS (2023 FSEIS, Section 3.3.2).

---

[9] "The Forest Service and the BLM erroneously failed to account for real-world data suggesting increased sedimentation along the Pipeline route. There is no evidence that the agencies reviewed the USGS water quality monitoring data from the Roanoke River, which may indicate a significant increase in sedimentation beyond that predicted in the modeling used for the supplemental EIS". Wild Virginia, 24 F.4th at 920.

[10] Wild Virginia, 24 F.4th at 928.

### Responsiveness to Key Issue - review of the conventional bore method to construct stream crossings

On August 13, 2021, FERC published an EA analyzing Mountain Valley's request to change the crossing method of specific waterbodies and wetlands from open-cut dry crossings to trenchless (i.e., conventional bore, guided conventional bore, or DirectPipe®) methods. This 2021 FERC Boring EA addressed 120 crossings in 12 counties in Virginia and West Virginia. On April 8, 2022, after consideration of public comments received on the EA, the FERC issued an order amending the Certificate of Public Convenience and Necessity granted, to MVP to allow the use of trenchless (e.g., conventional bore) waterbody and wetland crossings at 120 locations along the MVP route. The FERC EA did not address the four stream crossings on NFS lands because the FERC had already issued partial approval[11] for conventional bore stream crossings on the JNF (FERC 2020b).

The Court ruled in its 2022 Opinion that the 2021 USFS ROD had improperly approved the use of the conventional bore method for crossing the four streams on the JNF without first considering FERC's analysis on assessing the potential environmental impacts of the conventional bore method.[12]

The 2023 FSEIS provides an independent agency review of the 2021 FERC Boring EA analysis regarding conventional boring stream crossing methods and its applicability to stream crossings on the JNF (2023 FSEIS, Sections 3.2, 3.3.2, 3.3.3). Specifically, Appendix C of the 2023 FSEIS provides additional context regarding the proposed stream crossings.

The Forest Service's review concluded that the analysis of conventional bore methods in the 2021 FERC Boring EA is consistent with the conclusions found in the 2020 FSEIS and that, overall, conventional bore crossings would result in fewer adverse effects for stream crossings on NFS lands.

The Under Secretary's decision (see Section 2 above) is supported by the rationale that the 2023 FSEIS responds to the Court-identified deficiency by demonstrating that the Forest Service has conducted a full independent agency review of the 2021 FERC Boring EA (2023 FSEIS, Appendix C), and that the Forest Service has considered and disclosed the effects of conventional bore methods to cross streams on the JNF (2020 FSEIS, Sections 3.3 and 3.4, 2023 FSEIS, Sections 3.2 and 3.3).

### Responsiveness to Key Issue – compliance with the 2012 Planning Rule (36 CFR Part 219)

In January 2021, the Fourth Circuit found the Forest Service improperly applied the Planning Rule (36 CFR 219) in the 2021 Forest Plan amendment. The Court found a need for the Forest Service to better identify the purpose and the effects of the amendment to be consistent with the Planning Rule and the NFMA.

Specifically, the Court found that the Forest Service improperly applied the Planning Rule (36 CFR Part 219) and did not "properly apply the 2012 Planning Rule's soil and riparian resources requirements to the pipeline amendments." Namely, the Court found that the Forest Service improperly applied the Planning Rule (36 CFR Part 219) in the Forest Plan amendment. Specifically, the Court found the Forest Service applied the incorrect legal standard for determining if the amendment complies with the substantive requirement; did not sufficiently consider the actual sediment and erosion impacts; did not have a clear indication of impacts of the use of the conventional bore method because FERC had not completed its

[11] On October 27, 2020, Mountain Valley filed a request to change the crossing technique for NFS streams from an open-cut dry ditch method to conventional bores to reduce potential sedimentation impacts in the JNF. The FERC approved the request to modify the proposed crossing method for streams on NFS lands but did not authorize construction; construction remains contingent on other outstanding Federal authorizations.
[12] Wild Virginia, 24 F.4th at 930.

analysis; cannot rely on the notion that the pipeline will affect only a minimal fraction of the entire Jefferson National Forest; and did not provide an analysis of whether application of the existing Forest Plan is adequately protecting resources elsewhere in the Jefferson National Forest.

Chapter 3 and Appendix A of the 2023 FSEIS resolve the issues identified by the Fourth Circuit by adding a new analysis of the purpose for the amendment and its effects of the proposed project-specific forest plan amendment in the context of the substantive requirements of the 2012 Planning Rule. The 2023 FSEIS Appendix A analysis of the proposed forest plan amendment provides the supporting rationale for the Under Secretary's decision to amend the JNF Forest Plan, consistent with the authorities and process given in 36 CFR § 219.

In deciding to amend the JNF Forest Plan, eleven Forest Plan standards will be modified (see Section 2.2 above) to allow the Project to be consistent with the Forest Plan, which will allow the BLM to grant a ROW. Those modified standards are:

- FW-5 (revegetation)
- FW-8 (soil compaction in water saturated areas)
- FW-9 (soil effects from heavy equipment use)
- FW-13 (exposed soil)
- FW-14 (residual basal area within the channeled ephemeral zone)
- FW-184 (scenic integrity objectives).
- FW-248 (utility corridors)
- 4A-028 (Appalachian National Scenic Trail [ANST] and utility corridors)
- 6C-007 (tree clearing)
- 6C-026 (utility corridors in the old growth management area)
- 11-003 (exposed soil within the riparian corridor)

Each of these modifications are project-specific, exempting only the MVP project from compliance with only those 11 modified standards. The exemption will only apply to the 54 acres of the construction zone (i.e., temporary construction ROW) including the 22 acres of the ROW grant.

Section 3.3.4 and Appendix A of the 2023 FSEIS also describe the process used to identify the substantive requirements that are directly related to the proposed amendment and how they are applied. Whether a substantive requirement is directly related to an amendment is determined by any one of the following: the purpose of the amendment, a beneficial effect of the amendment, a substantial adverse effect of the amendment, or a substantial lessening of plan protections by the amendment (36 CFR § 219.13(b)(5)). For the eleven standards that will be modified, the purpose of the amendment was the primary factor used to determine which requirement was directly related.

The NFMA analysis in Chapter 3 and Appendix A further finds that the following twelve substantive requirements are directly related to those eleven standards to be modified:

- 219.8(a)(1) – Ecosystem integrity due to the modification of standards FW-5, FW-8, FW-9, FW-13, FW-14, and 11-003.
- 219.8(a)(2)(ii) – Soils and soil productivity due to the modification of standards FW-5, FW-8, FW-9, FW-13, FW-14, and 11-003.
- 219.8(a)(2)(iii) – Water quality due to the modification of standards FW-5, FW-8, FW-9, FW-13, FW-14, and 11-003.
- 219.8(a)(2)(iv) – Water resources due to the modification of standards FW-5, FW-8, FW-9, FW-13, FW-14, and 11-003.
- 219.8(a)(3)(i) – Ecological integrity of riparian areas due to the modification of standards FW-5, FW-8, FW-9, FW-13, FW-14, and 11-003.
- 219.8(b)(3) – Multiple uses that contribute to local, regional, and national economies due to the amendment itself.
- 219.9(a)(1) – Ecosystem integrity due to the modification of standards 6C-007 and 6C-026.
- 219.9(a)(2) – Ecosystem diversity due to the modification of standards 6C-007 and 6C-026.
- 219.10(a)(3) – Appropriate placement and sustainable management of infrastructure, such as recreational facilities and transportation and utility corridors due to the modification of standards FW-248, 4A-028, and 6C-026.
- 219.10(b)(1)(i) – Sustainable recreation, including recreation setting, opportunities, access; and scenic character due to the modification of standards FW-184 and 4A-028.
- 219.10(b)(1)(vi) – Appropriate management of other designated areas or recommended designated areas in the plan area, including research natural areas due to the modification of standard 4A-028.
- 219.11(c) – Timber harvest for purposes other than timber production due to the modification of standards FW-14, 6C-007.

The Forest Service has considered the scope and scale of the project-specific amendment in the context of the JNF Plan (2023 FSEIS, Section 3.3.4.3) and finds that five of the directly related substantive requirements are sufficiently applied within the scope of scale of the amendment because the Jefferson Forest Plan, as amended, contains plan components to meet the applicable directly related substantive requirements of the 2012 Planning Rule. (See Table 1 below.) For the remaining seven directly related substantive requirements, the Under Secretary determined that an additional MVP-specific plan standard should be added to the scope of the amendment in order to ensure the amended plan will continue to meet the 2012 Planning rule requirements (Table 1, below). Compliance with the NFMA is further detailed in Section 5.1 of this ROD.

The Under Secretary's decision is supported by the rationale that the 2023 FSEIS responds to the Court-identified NFMA deficiencies by fully analyzing the purpose and the effects of the project-specific amendment, disclosed in the 2023 FSEIS in Chapter 3 and Appendix A.

**Table 1. Summary of Plan Amendment by Standard to be Modified/Added Standard.**

| **Forest Plan Standard to be Modified** | *Substantive Requirement* | **Required Protection Measures in the POD** |
|---|---|---|
| **Standard FW-5:** On all soils dedicated to growing vegetation, the organic layers, topsoil and root mat will be left in place over at least 85% of the activity area and revegetation is accomplished within 5 years, *with the exception of the MVP construction zone and right-of-way.* | • § 219.8(a)(1) – ecosystem integrity<br>• § 219.8(a)(2)(ii) – soils and soil productivity<br>• § 219.8(a)(2)(iii) – water quality<br>• § 219.8(a)(2)(iv) – water resources<br>• § 219.8(a)(3)(i) – ecological integrity of riparian areas | • Appendix C-1 and C-2, Erosion and Sediment Control Plan<br>• Appendix H, Restoration Plan<br>• Appendix E – ANST Contingency Plan<br>• Appendix N – Environmental Compliance Management Plan |
| **Standard FW-8:** To limit soil compaction, no heavy equipment is used on plastic soils when the water table is within 12 inches of the surface, or when soil moisture exceeds the plastic limit, *with the exception of the MVP construction zone and right-of-way.* Soil moisture exceeds the plastic limit when soil can be rolled to pencil size without breaking or crumbling. | • § 219.8(a)(1) – ecosystem integrity<br>• § 219.8(a)(2)(ii) – soils and soil productivity<br>• § 219.8(a)(2)(iii) – water quality<br>• § 219.8(a)(2)(iv) – water resources<br>• § 219.8(a)(3)(i) – ecological integrity of riparian areas | • Appendix C-1 and C2, Erosion and Sediment Control Plan<br>• Appendix H, Restoration Plan<br>• Appendix E – ANST Contingency Plan<br>• Appendix N – Environmental Compliance Management Plan |
| **Standard FW-9:** Heavy equipment is operated so that soil indentations, ruts, or furrows are aligned on the contour and the slope of such indentations is 5% or less, *with the exception of the MVP construction zone and right-of-way.* | • § 219.8(a)(1) – ecosystem integrity<br>• § 219.8(a)(2)(ii) – soils and soil productivity<br>• § 219.8(a)(2)(iii) – water quality<br>• § 219.8(a)(2)(iv) – water resources<br>• § 219.8(a)(3)(i) – ecological integrity of riparian areas | • Appendix C-1 and C-2, Erosion and Sediment Control Plan<br>• Appendix H, Restoration Plan<br>• Appendix E – ANST Contingency Plan<br>• Appendix N – Environmental Compliance Management Plan |

**Table 1 (continued). Summary of Plan Amendment by Standard to be Modified/Added Standard.**

| **Forest Plan Standard to be Modified** | *Substantive Requirement* | **Required Protection Measures in the POD** |
|---|---|---|
| **Standard FW-13**: Management activities expose no more than 10% mineral soil in the channeled ephemeral zone *with the exception of the MVP construction zone and right-of- way*. | • § 219.8(a)(1) – ecosystem integrity<br>• § 219.8(a)(2)(ii) – soils and soil productivity<br>• § 219.8(a)(2)(iii) – water quality<br>• § 219.8(a)(2)(iv) – water resources<br>• § 219.8(a)(3)(i) – ecological integrity of riparian areas | • POD Appendix C-1 and C-2, Erosion and Sediment Control Plan<br>• Appendix N – Environmental Compliance Management Plan |
| **Standard FW-14:** In channeled ephemeral zones, up to 50% of the basal area may be removed down to a minimum basal area of 50 square feet per acre. Removal of additional basal area is allowed on a case-by-case basis when needed to benefit riparian-dependent resources, *with the exception of the MVP construction zone and right-of-way*. | • § 219.8(a)(1) – ecosystem integrity<br>• § 219.8(a)(2)(ii) – soils and soil productivity<br>• § 219.8(a)(2)(iii) – water quality<br>• § 219.8(a)(2)(iv) – water resources<br>• § 219.8(a)(3)(i) – ecological integrity of riparian areas<br>• § 219.11(c) – timber harvesting for purposes other than timber production | • Appendix C-1 and C-2, Erosion and Sediment Control Plan<br>• Appendix N – Environmental Compliance Management Plan |
| **Standard FW-184:** The Forest Scenic Integrity Objectives (SIOs) Maps govern all new projects (including special uses), *with the exception of the MVP construction zone and right-of-way.* Assigned SIOs are consistent with Recreation Opportunity Spectrum management direction. Existing conditions may not currently meet the assigned SIO. | • § 219.10(b)(1)(i) – sustainable recreation, including recreation setting, opportunities, access; and scenic character | • Appendix H, Restoration Plan<br>• Appendix N – Environmental Compliance Management Plan |
| **Standard FW-248:** Following evaluation of the above criteria, decisions for new authorizations outside of existing corridors and designated communication sites will include an amendment to the Forest Plan designating them as Prescription Area 5B or 5C, *with the exception of the MVP construction zone and right-of-way.* | • § 219.10(a)(3) – appropriate placement and sustainable management of infrastructure, such as recreational facilities and transportation and utility corridors | • N/A |

**Table 1 (continued). Summary of Plan Amendment by Standard to be Modified/Added Standard.**

| **Forest Plan Standard to be Modified** | *Substantive Requirement* | **Required Protection Measures in the POD** |
|---|---|---|
| **Standard 4A-028:** Locate new public utilities and rights-of-way in areas of this management prescription area where major impacts already exist, *with the exception of the MVP construction zone and right-of-way*. Limit linear utilities and rights- of-way to a single crossing of the prescription area, per project. | • §219.10(a)(3) – appropriate placement and sustainable management of infrastructure, such as recreational facilities and transportation and utility corridors<br>• § 219.10(b)(1)(i) – sustainable recreation, including recreation setting, opportunities, access; and scenic character<br>• § 219.10(b)(1)(vi) – appropriate management of other designated areas or recommended designated areas in the plan area, including research natural areas | • Appendix E, ANST Contingency Plan<br>• Appendix N – Environmental Compliance Management Plan |
| **Standard 6C-007:** Allow vegetation management activities to: maintain and restore dry-mesic oak forest, dry and xeric oak forest, dry and dry-mesic oak-pine old growth forest communities; restore, enhance, or mimic historic fire regimes; reduce fuel buildups; maintain rare communities and species dependent on disturbance; provide for public health and safety; improve threatened, endangered, sensitive, and locally rare species habitat; control non-native invasive vegetation, *with the exception of the MVP construction zone and right-of-way.* | • § 219.9(a)(1) – ecosystem integrity<br>• § 219.9(a)(2) – ecosystem diversity<br>• § 219.11(c) – timber harvesting for purposes other than timber production | • N/A |
| **Standard 6C-026:** These areas are unsuitable for designation of new utility corridors, utility rights-of-way, or communication sites, with the exception of the MVP construction zone and right-of-way. Existing uses are allowed to continue. | • § 219.9(a)(1) – ecosystem integrity<br>• § 219.9(a)(2) – ecosystem diversity<br>• § 219.10(a)(3) – Appropriate placement and sustainable management of infrastructure, such as recreational facilities and transportation and utility corridors. | • N/A |

**Table 1 (continued). Summary of Plan Amendment by Standard to be Modified/Added Standard.**

| **Forest Plan Standard to Be Modified/Added** | *Substantive Requirement* | **Required Protection Measures in the POD** |
|---|---|---|
| **Standard 11-003:** Management activities expose no more than 10% mineral soil within the Project area riparian corridor, *with the exception of the MVP construction zone and right-of-way.* | • § 219.8(a)(1) – ecosystem integrity<br>• § 219.8(a)(2)(ii) – soils and soil productivity<br>• § 219.8(a)(2)(iii) – water quality<br>• § 219.8(a)(2)(iv) – water resources<br>• § 219.8(a)(3)(i) – ecological integrity of riparian areas | • Appendix C-1 and C-2, Erosion and Sediment Control Plan<br>• Appendix M – Winter Construction Plan<br>• Appendix N – Environmental Compliance Management Plan |
| **MVP-Specific Standard –** *To minimize environmental impacts to soils, water, riparian areas, the ANST, and scenery resources, adherence and implementation of the following MVP Plan of Development (POD) appendices must be followed during the construction and restoration phases of the Project: C-1 (West Virginia Erosion and Sediment Control Plan), C-2 (Virginia Erosion and Sediment Control Plan), E (Conventional Bore Contingency Plan for the Proposed Crossing of the Appalachian National Scenic Trail), H (Restoration Plan), M (Winter Construction Plan), and N (Environmental Compliance Management Plan)* | • § 219.8(a)(1) – ecosystem integrity<br>• § 219.8(a)(2)(ii) – soils and soil productivity<br>• § 219.8(a)(2)(iii) – water quality<br>• § 219.8(a)(2)(iv) – water resources<br>• § 219.8(a)(3)(i) – ecological integrity of riparian areas<br>• § 219.10(b)(1)(i) – sustainable recreation, including recreation setting, opportunities, access; and scenic character<br>• § 219.10(b)(1)(vi) – appropriate management of other designated areas or recommended designated areas in the plan area, including research natural areas | • Appendix C-1 and C-2, Erosion and Sediment Control Plan<br>• Appendix E – ANST Contingency Plan<br>• Appendix H, Restoration Plan<br>• M (Winter Construction Plan),<br>• Appendix N – Environmental Compliance Management Plan |

*Note: Substantive requirement 219.8(b)(3) – multiple uses that contribute to local, regional, and national economies is directly related due to beneficial effects of the Project as a whole and is not directly related to a specific modified Forest Plan standard.

## 3.3 Alternatives Considered

**No Action Alternative**
The No Action Alternative is unchanged from the 2020 FSEIS (p. 33). In summary, under the No Action Alternative, the Forest Plan would not be amended, and no concurrence would be provided to the BLM for granting of a ROW across NFS lands for the construction and operation of the MVP. The current Forest Plan would continue to guide management of NFS lands in the Project area.

The Forest Service would require Mountain Valley to remove pipes[13] and associated staging materials and restore the JNF project area to as close to the pre-project condition as practicable or possible.

**Proposed Action Alternative**
As described in detail in the 2020 FSEIS (pp. 33 to 45), under the proposed action, the Forest Service would amend the JNF Forest Plan as necessary to allow for the MVP to cross the JNF and concur in a decision by the BLM to grant a ROW and a TUP under the MLA. Changes to the Proposed Action since publication of the 2020 FSEIS include using a conventional bore method for crossing the four streams on NFS lands (the potential use of dry-ditch open trench methods is no longer under consideration). The ROW grant and TUP would incorporate relevant portions of the 2023 FWS BO (for example, portions related to species [e.g., listed bats] which have the potential to be affected by activities on NFS lands) (FWS 2023a).

Consistent with the Forest Service's plan amendment, the Forest Service would provide concurrence and the BLM would grant a ROW and a TUP under the MLA, 30 U.S.C. § 185, for the Project to cross the JNF. The MLA ROW would include terms and conditions, or stipulations, to protect resources and the public interest consistent with the MLA, 30 U.S.C. § 185(h). The construction and operation and maintenance actions that would be addressed in these terms and conditions include:

- Construction of a 42-inch pipeline across 3.5 miles of the JNF.
- The use of a 125-foot-wide temporary construction ROW for pipeline installation and trench spoil. Once construction is complete, the MVP would retain a 50-foot-wide authorized ROW to operate the pipeline.
- Installation of surface pipeline markers to advise the public of pipeline presence and cathodic pipeline protection test stations that are required by DOT.

Implementation of the Proposed Action is contingent upon adhering to the Forest Service-approved POD and FERC's general construction, restoration, and operational mitigation measures as outlined in the FERC Plan (FERC 2013a), FERC Procedures (FERC 2013b), and other Federal and State regulatory agency requirements.

Table 2 below displays the acres and miles of NFS lands that would be required for the construction, operation, and maintenance of the MVP.

[13] All pipes on NFS lands are currently stored aboveground on wood cribbing; no pipes have been buried on NFS lands.

**Table 2. NFS Lands Required for MVP Construction, Operation, and Maintenance**

| Area | Units Impacted* |
|---|---|
| NFS lands crossed | 3.5 miles |
| 125-foot-wide temporary construction ROW | 54 acres[1] |
| 50-foot-wide[2] authorized ROW | 22 acres |

* Rounded to the nearest tenth of a mile (source: MVP 2022a) or nearest whole acre
[1] Includes authorized ROW acreage
[2] The width of the authorized ROW is 50 feet (including the ground occupied by the pipeline)

## Alternatives Considered but Dismissed

In response to comments, the Forest Service evaluated new alternatives for the Project. These alternatives were considered but dismissed from detailed analysis (2023 FSEIS Section 2.3).

**Programmatic Amendment to the Forest Plan** – This alternative would add Plan components (standards and guidelines) within the vicinity of the MVP project that would apply to all future projects in perpetuity, unless another future project-specific amendment provided exemptions or a revision occurs. This alternative was considered but dismissed from detailed analysis because of the expected minor long-term impacts from MVP and overall, there were no direct additional benefits to resources from a programmatic amendment.

**Amending Forest Plan to Include Certain Plan of Development (POD) Appendices as a Forest Plan Guideline** –This alternative was considered but dismissed from detailed analysis because the agency recognized the importance of the provisions for soils, water quality, riparian areas, and the ANST. Lowering these provisions from a standard to a guideline does not reflect the importance of ensuring the substantive requirements related to these resources are met.

**Use of Compensatory Mitigation** – This alternative would require the proponent to provide compensatory mitigation to fund restoration projects or parcel acquisition outside of the ROW. This alternative was dismissed from detailed analysis because specific opportunities identified for compensatory mitigation were either unavailable, too speculative, and/or lacked a clear nexus to the impacted NFS lands and resources.

Although not specific to the JNF and not part of the 2021 Revised Historic Property Treatment Plan, the MVP voluntarily entered into a three-party agreement in August of 2020 to mitigate potential adverse effects on the ANST, a compensatory mitigation action (FERC 2021). The voluntary agreement that was revised in 2021 states MVP will provide up to $19.5 million to the ATC for actions that would benefit the ANST trail users and local trail-dependent business (MVP 2021).

## Environmentally Preferable Alternative

The environmentally preferable alternative is the alternative that best promotes the national environmental policy as provided by Section 101 of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321. Ordinarily, the environmentally preferred alternative causes the least damage to the biological and physical environment (36 C.F.R. § 220.3). In application, the environmentally preferable alternative seeks to attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences and while preserving important historic, cultural, and natural aspects of our national heritage.

This decision's evaluation of the environmentally preferred alternative focuses on the 3.5 miles that affect the JNF and not the entire pipeline route. On the JNF, much of the disturbance to the physical and biological environment has already occurred. After the 2017 USFS ROD and the BLM issuance of the ROW grant, implementation began. All trees in the proposed ROW were felled to create the ROW corridor. On Sinking Creek Mountain and Brush Mountain, soils were removed from the ROW and stockpiled, and erosion control devices were installed. Since FERC issued the Stop Work Order in July 2018, stabilization activities have been in place. These stabilization activities include seeding of the disturbed ROW on NFS lands, installation of erosion control devices, and maintenance of the sedimentation and erosion control measures.

Alternative 2, the selected alternative, is the environmentally preferable alternative. Implementation of Alternative 2 is environmentally preferred because it would require continuation of existing mitigations of the environmental effects on NFS lands, and implementation of further mitigations (2023 FSEIS, Section 2.2.2.2). Environmental mitigation required by Alternative 2 is provided by the terms and conditions that the Forest Service will submit to the BLM for inclusion in the ROW grant (see Section 2.3 above). The No Action alternative lacks requirements for environmental mitigations in the event of off-NFS construction.

Additional disturbance would occur if either alternative were implemented (2023 FSEIS, Section 2.4). Under Alternative 1 (no action), the proponent would be required to restore the project area on JNF lands to as close to the pre-project condition as practicable or possible (2023 FSEIS, Section 2.2.1). Regrowth of non-native species, namely princess tree and tree of heaven, would be an adverse effect of Alternative 1 (2023 FSEIS, Section 3.2.8).

If Mountain Valley pursued completing the pipeline along a different route, a potential increase in area of disturbance would occur on non-NFS lands, particularly increasing effects to wetlands and waterbodies. Table 3 below provides a comparison of environmental effects differing between a route which would avoid NFS lands and the Proposed Route.

**Table 3. Comparison of Proposed Action and NFS Lands Avoidance Route**

| Feature | Forest Service Avoidance Route[14] | Proposed Action Alternative |
|---|---|---|
| **General** | | |
| Total length (miles) | 351 | 303.5 |
| Length adjacent to existing ROW (miles) | 332 | 22 |
| Land disturbed within construction ROW (acres) | 5,301 | 4,556 |
| **Land Use** | | |
| Populated areas within ½ mile (number) | 31 | 8 |
| National Forest System lands crossed (miles) | 0 | 3.4 |
| National Forest Wilderness crossed (miles) | 0 | 0 |
| ANST crossings (number) | 1 | 1 |
| Blue Ridge Parkway crossings (number) | 0 | 1 |
| NRHP designated or eligible historic districts crossed (miles) | 0.1 | 10.1 |
| Landowner parcels crossed (number) | 1,743 | 1,495 |
| Residences within 50 feet of construction workspace (number) | 168 | 63 |
| **Resources** | | |
| Forested land crossed (miles) | 206.0 | 245.2 |
| Forested land affected during construction (acres) | 3,121.2 | 3,720.0 |
| Forested land affected during operation (acres) | 1,248.5 | 1,486.0 |
| Interior forest crossed (miles) | 41.1 | 129.8 |
| Wetlands (National Wetlands Inventory) crossed (feet) | 18,918 | 3,299 |
| Forested wetlands crossed (feet) | 7,761 | 1,721 |
| Forested wetlands affected by construction (acres) | 13.4 | 3.0 |
| Forested wetlands affected by operation (acres) | 8.9 | 2.0 |
| Perennial waterbody crossings (number) | 206 | 97 |

Alternative 2 provides the widest range of beneficial uses, because it fulfills the need to respond to Mountain Valley's proposal to construct energy infrastructure on NFS lands. Alternative 2 meets the energy infrastructure and economic development priorities that have been set by the Federal Government and the USDA.

Alternative 2 will preserve historic, cultural and other important aspects of our heritage including the ANST. ANST users could experience minor short-term impacts from noise and construction dust but long-term impacts are not anticipated (2020 FSEIS, Sec 3.4.4 and 2023 FSEIS, Sec. 3.2.14). Historic and cultural resources will be protected in compliance with the NHPA, occurring through the use of an executed Programmatic Agreement (2020 FSEIS, Sec. 3.3.3 and 2023 FSEIS Sec. 3.2.3).

In balancing environmental consequences disclosed in the 2020 FSEIS and 2023 FSEIS with the widest range of beneficial uses, while also preserving important historic, cultural, and natural aspects of our national heritage, Alternative 2 is the environmentally preferable alternative.

The Under Secretary's decision to select Alternative 2 is supported by rationale that it is environmentally preferable, it best fulfills the purpose and need to respond to the proposal, and it accommodates infrastructure development.

[14] The Forest Service Avoidance route is the only pipeline route that is entirely off of NFS lands (see 2020 SF-299 application).

## 3.4 Public Involvement Which Informed This Decision

The 2017 FERC FEIS, Section 1.4 (pp. 1-27 to 1-38), documents the public involvement that occurred from April 2015 through December 22, 2016. The Notice of Intent (NOI) to prepare an Environmental Impact Statement (EIS) was published in the Federal Register on April 17, 2015. The NOI was sent to 2,846 parties, including Federal, state, and local government agencies; elected officials; environmental groups and non-government organizations; Native Americans and Indian tribes; affected landowners; local libraries and newspapers; and other stakeholders who had indicated an interest in the MVP. The NOI initiated a 60-day formal scoping period and the FERC sponsored six public scoping meetings in the project area. Approximately 650 people attended those meetings. In addition to the NOI and the public scoping meetings, the FERC sent out brochures that updated the status of the environmental review process. The FERC received 964 comment letters during the scoping period and 428 letters after the scoping period had ended.

On September 16, 2016, the Notice of Availability (NOA) for the 2017 FERC DEIS was published in the Federal Register, and a 90-day comment period ran until December 22, 2016. The notice was sent to approximately 4,400 parties and during the comment period, seven meetings were held in the vicinity of the project area. The FERC received 1,237 written individual letters or electronic comments.

On July 30, 2020, an NOI was published in the Federal Register, informing the public of the Forest Service's intent to prepare a Supplemental EIS. The NOI also clarified that the requirement for scoping (40 CFR § 1501.7; 36 CFR § 220.4(c)(1)), had been fulfilled as completed and summarized in the 2017 FERC FEIS. White House Council on Environmental Quality (CEQ) NEPA regulations do not require scoping for an SEIS (40 CFR § 1502.9(c)(4)). A revised NOI was published December 2, 2020, to correct information regarding pre-decisional administrative review and responsible official.

On September 25, 2020, the NOA for the 2020 USFS Draft SEIS was published in the FR (85 FR 60458). The publication of the NOA initiated a 45-day comment period which ended on November 9, 2020. Approximately 4,400 comment letters were received during the 45-day comment period for the 2020 DSEIS. Timely comments were given full consideration and were analyzed for substantive content (40 CFR 1503.3 and 40 CFR 1503.4). Content from analysis of comments yielded 136 statements which summarized the concerns expressed through public comment. These concern statements and agency responses can be found in Appendix C of the 2020 FSEIS. Literature and references submitted with public comments was also reviewed for consideration. Where new information was found, it was assessed and, in some cases, resulted in changes to the 2020 FSEIS. The NOA for the 2020 FSEIS was published in the Federal Register on December 11, 2020.

On December 23, 2022, the NOA for the 2022 DSEIS was published in the FR (87 FR 78961). The publication of the NOA initiated a 45-day comment period that was scheduled to end on February 6, 2023. In response to public comments, the Forest Service extended the comment period two weeks until February 21, 2023 (88 FR 8843). Approximately 364 comment letters, 9,100 form letters, and 53,781 signatures submitted via petitions were received during the 60-day comment period. Timely comments were given full consideration and were analyzed for substantive content (40 CFR § 1503.3 and 40 CFR § 1503.4). Content from analysis of comments yielded 219 statements which summarized the concerns expressed through public comment. These concern statements and agency responses can be found in Appendix E of the 2023 FSEIS.

Rationale for the Under Secretary's decision is supported by the consideration for public comment and opportunity for public involvement, both found in the 2017 FERC FEIS, 2020 FSEIS, and the 2023 FSEIS.

## 3.5 Use of Best Available Scientific Information (36 CFR § 219.3)

This decision to amend the JNF Forest Plan is informed, in part, by the 2017 FERC FEIS, the 2020 FSEIS, the 2021 FERC Boring EA, the supporting project records, and the analysis displayed in the 2023 FSEIS, all of which are based on the use of Best Available Science Information (BASI).

The Forest Service Planning Regulations at 36 CFR § 219.3 provides direction on the incorporation and use of BASI. The Forest Service planning regulations state that the responsible official shall use the best available scientific information to inform the planning process. In doing so, the responsible official shall determine what information is the most accurate, reliable, and relevant to the issues being considered.

BASI was used to inform this decision, specifically but not limited to: soil and riparian resources, local, regional and national socio-economic trends, sedimentation effects, and biological species (such as Endangered, Threatened and Sensitive species, and Regional Forester Sensitive Species). BASI was also used to inform the analysis on how the forest plan amendment met planning rule requirements (2023 FSEIS, Section 3.3.2.2) in accordance with 36 CFR § 219.14(a)(3)).

The 2023 FSEIS contains an independent agency review of new circumstances and relevant information, including the 2022 Supplement to the Biological Assessment (SBA), the February 27, 2023 FWS letter[15], and the February 28, 2023 FWS BO (MVP 2022b, FWS 2023a, FWS 2023b).

This decision relies upon the 2017 FERC FEIS, the 2020 FSEIS, the 2021 FERC Boring EA, and the 2023 FSEIS, all of which use a variety of information sources to generate professional judgments regarding probable effects. For example, professional conclusions about sedimentation issues are informed by the Hydrologic Analyses (Geosyntec Consultants 2020a and 2020b) and USGS in-stream water quality monitoring station data; approved erosion and sediment control plans; monitoring reports; field visits and personal observation; scientific literature; communication with Jefferson National Forest professional resource specialists; and opposing views, data, and information described in public comments on the 2020 DSEIS and 2022 DSEIS.

Unpublished information provided by cooperative Forest Service monitoring efforts was reviewed, as was information provided by interest groups with knowledge and expertise. Some members of the public submitted scientific information during and outside the public comment period and this information was also reviewed. Cooperation between county, State, and Federal agencies and tribes also contributed to the best available scientific information. Literature and references submitted with public comments were reviewed for consideration. Where new information was found, regardless of the source, it was assessed and, in some cases, resulted in changes to the 2023 FSEIS. Changes between the 2022 Draft SEIS (2022 DSEIS) and 2023 FSEIS are disclosed in the 2023 FSEIS, Section 1.7.

By following the Agency's planning regulations, this decision is based on sound science, supported by a thorough independent agency review by Federal scientists, local resource professionals and support staff of that science and modeling.

The Under Secretary's decision is informed by the Forest Service's independent agency review of BASI, as disclosed in the 2023 FSEIS and the planning record. The use of BASI provides supporting rationale for this decision, and this decision certifies the use of the most accurate and reliable scientific information available that is relevant to the issues considered in this analysis (36 CFR 219.3).

[15] On February 27, 2023, the FWS responded to the January 26, 2023 letter from FERC providing updated determinations of effects for proposed and listed species and proposed and designated critical habitat under the ESA.

# 4 Other Context Which Informs the Decision

Included below is pertinent information and context which supports this decision.

## 4.1 Changes to Resource Conditions

Forest Service and BLM resource specialists reviewed the 2017 FERC FEIS and the 2020 FSEIS to identify any changed circumstances or new information that should be supplemented with further analysis in the 2023 FSEIS. Resource specialists found that much of the previous and existing analyses are still applicable and relevant; however, they also found some portions of the analyses warranted supplementation because of changed circumstances or new information, including:

- The ROW on NFS lands continues to be monitored and ECDs maintained as needed.
- There has been continued regrowth of early successional vegetation within the MVP ROW on Peters Mountain.
- There have been changes to past, present, and reasonably foreseeable future projects within the watersheds that comprise the cumulative effects analysis spatial boundary.
- Beginning in 2021, MVP conducted sediment monitoring in two watersheds off NFS lands per the terms and conditions of the 2020 FWS BO.
- The FERC issued the Mountain Valley Pipeline Amendment Project EA (2021 FERC Boring EA) in August 2021 assessing effects of conventional boring for waterbody crossings.
- The Fourth Circuit remanded the Forest Service and BLM RODs on January 25, 2022.
    - The FWS revised the list and status of several federally listed species. FWS issued a new BO on February 28, 2023, with the following ESA changes:
        - Critical Habitat for the candy darter (*Etheostoma osburni*) was designated on April 7, 2021 and became effective on May 7, 2021 (86 FR 17956).
        - The Atlantic pigtoe (*Fusconaia masoni*) was listed as Threatened under the ESA and Critical Habitat was designated on December 16, 2021.
        - On November 29, 2022, the FWS reclassified the northern long-eared bat (*Myotis septentrionalis*) from Threatened to Endangered under the ESA.
        - On September 13, 2022, the FWS proposed to list the tricolored bat (*Perimyotis subflavus*) as Endangered, and a decision is expected September 2023.
        - Running buffalo clover (*Trifolium stoloniferum*) was delisted from the ESA on August 6, 2021.
- The Forest Service is in the process of revising the list of Region 8 Regional Forester Sensitive Species (RFSS) with the following proposed draft changes:
        - Four species are proposed to be added: Tennessee dace (*Chrosomus tennesseensis*), American bumble bee (*Bombus pensylvanicus*), little brown bat (*Myotis lucifugus*), and American ginseng (*Panax quinquefolius*).
        - Ten species are proposed to be removed: Sickle darter (*Percina williamsi*), Appalachia bellytooth (*Gastrodonta fonticula*), highland slitmouth (*Stenotrema altispira*), crossed dome (*Ventridens decussatus*), Rafinesque's big-eared bat (*Corynorhinus rafinesquii*), brown supercoil (*Paravitrea septadens*), delicate vertigo (*Vertigo bollesiana*), cupped vertigo (*Vertigo clappi*), Allegheny cave

amphipod (*Stygobromus allegheniensis*), and Avernus cave beetle (*Pseudanophthalmus avernus*).

- In October 2022, the Forest Service and the BLM conducted a site visit on NFS lands, including a review of all NFS stream crossings to verify existing conditions and Transcon monitoring report findings.
- A Professional Wetland Scientist conducted a field visit in February 2023 to confirm the boundaries of riparian areas associated with each of the four proposed stream crossings on NFS lands.

The 2023 FSEIS also contains an independent agency review of the 2022 SBA, the February 27, 2023, FWS letter[16], and the February 28, 2023, FWS BO (MVP 2022b, FWS 2023a, FWS 2023b).

After assessment, the Forest Service found that changes to resource conditions would warrant supplemental analysis for the following resource areas: Water, Threatened & Endangered Species, and NFMA.

Supplemental analysis of those resources is disclosed in the 2023 FSEIS at Section 3.3. The Under Secretary's decision to select Alternative 2 as disclosed in the 2023 FSEIS is further supported with rationale that the 2023 FSEIS considered changed conditions and new information in its analysis of effects.

## 4.2 Organic Act, Multiple-Use Sustained Yield Act, and National Energy Policy

The Forest Service has an affirmative responsibility to manage NFS resources for long-term productivity for the benefits of human communities and natural resource sustainability pursuant to the Organic Act, Multiple-Use Sustained Yield Act, and the Planning Rule.

In addition, the Forest Service has an affirmative responsibility to expedite applications for construction of natural gas pipelines across Federal land. The selection of Alternative 2 is the most expeditious path for development of the MVP project. The No-Action alternative disclosed in the 2023 FSEIS would not amend the JNF Forest Plan and would result in a delay as FERC would be required to issue a new decision, additional consultations, and additional analyses.

# 5 Findings Required by Other Laws, Regulations, and Policies

Information in this section demonstrates compliance with laws, regulations, and policy which are pertinent to this decision, the 2020 FSEIS, and the 2023 FSEIS.

## 5.1 National Forest Management Act (NFMA)

The NFMA requires regulations to guide Forest Service land use planning, which includes the amendment of plans. The National Forest System land management planning rule (the 2012 Rule, as amended) sets out requirements for the amendment of plans. See 36 CFR Part 219; specifically, §219.13 (81 FR 90738 (December 15, 2016)). The discussion under the section "Decision Rationale" explains how the decision

[16] On February 27, 2023, the FWS responded to the January 26, 2023 letter from FERC providing updated determinations of effects for proposed and listed species and proposed and designated critical habitat under the ESA.

meets the applicable requirements of the 36 CFR 219 planning rule and is consistent with NFMA; specifically, consideration of the best available scientific information, (§219.3), providing opportunities for public participation and public notice (§§219.4, 219.13 (b)(2), and 219.16), using the correct format for standards (§219.7 (e) and 219.13 (b)4)).

During the public comment period for the 2022 DSEIS, commenters questioned the project's compliance with several additional Forest Plan standards and project compliance with the 2012 Planning Rule (36 CFR 219) due to the exclusion of certain substantive requirements. The Forest Service responded in detail to these concerns in Appendix F of the FSEIS.

## 5.2 National Environmental Policy Act (NEPA)

Citations of the Code of Federal Regulations (CFR) throughout this decision and its supporting documents are in reference to the National Environmental Policy Act of 1978. This decision and supporting documents comply with the NEPA. To support the decision to amend the LRMP as outlined in this ROD, the Under Secretary has adopted the 2023 FSEIS and the 2017 FERC FEIS pursuant to 40 CFR 1506.3(c). Review of the 2023 FSEIS, the 2021 FERC Boring EA, the 2020 FSEIS and the 2017 FERC FEIS find they meet the requirements of NEPA, CEQ (40 CFR 1500-1508) and Forest Service regulations (36 CFR Part 220). Forest Service direction pertaining to implementation of NEPA and CEQ regulations is contained in chapter 10 and 20 of Forest Service Handbook 1909.15 (Environmental Policy and Procedures). The Forest Service provided opportunities for public involvement in development of the 2023 FSEIS and 2020 FSEIS, and comments received were used to develop a range of reasonable alternatives that addressed issues (2020 FSEIS, Sections 1.0 to 3.0 and 2023 FSEIS Sections 2 and 3). Using the best available scientific information (see Section 3.5 above and 2023 FSEIS Section 3.3.2.2), the 2023 FSEIS provides an adequate analysis and discloses the environmental effects related to amending the JNF Forest Plan in order for the MVP to be consistent with the LRMP. The analysis adequately addresses agency comments and design features and mitigation measures designed to reduce environmental impacts to soil, water, riparian, old growth management areas, the ANST, and visual resources. All practicable means to avoid or minimize environmental harm from the alternative selected have been identified in the POD and the monitoring and enforcement requirements in the Environmental Compliance Management Plan (POD, Appendix N) will be implemented.

## 5.3 National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires each Federal agency to take into account the effects of its actions on historic properties prior to approving expenditure of Federal funds on an undertaking or prior to issuing any license.

The FERC remains the lead agency for compliance with Section 106 of the NHPA. In 2017, the FERC and the other cooperating Federal agencies, including the Forest Service and the BLM, together with tribal governments, executed a single Programmatic Agreement (PA) with the West Virginia and Virginia State Historical Preservation Offices, fulfilling the obligations for compliance with the NHPA (36 CFR § 800.14(b)(3)). Under the PA, the FERC has responsibility to ensure that the stipulations in the PA are followed and that any required cultural resource treatment plans for sites on NFS lands have been completed, including a Treatment Plan for the mitigation of adverse effects to site 44GS0241.

In 2021, as part of the PA, the "Mountain Valley Pipeline Project, Revised Historic Property Treatment Plan, Appalachian National Scenic Trail Historic District" was prepared by the FERC. In sum, because this decision adopts portions of the 2017 FERC FEIS that are relevant to NFS lands and is party to the PA, this decision is compliant with NHPA.

In addition to participating in the PA, the Forest Service engaged tribal governments. As part of the 2020 SEIS process, the Forest Service contacted tribal governments from the Cherokee Nation, the Eastern Band of Cherokee Indians, the Monacan Indian Nation, and the United Keetoowah Band of Cherokee Indians in Oklahoma about the SEIS undertaking and outlining the FERC's involvement as the lead Federal agency for the pipeline project. Tribal authorities were asked to bring questions or queries to the Forest Supervisor as Project Manager of the supplemental analysis for discussion. Tribal governments were notified when the DSEIS, the FSEIS, and the ROD were available.

As part of the 2022 SEIS process, the Forest Service contacted tribal governments including the Absentee-Shawnee Tribe of Indians of Oklahoma, Cherokee Nation, Cherokee Nation of Oklahoma, Eastern Band of Cherokee Indians, Eastern Shawnee Tribe of Oklahoma, Monacan Indian Nation, Nansemond Indian Tribal Association, Rappahannock Tribe, United Keetoowah Band of Cherokee Indians in Oklahoma, Wyandotte Nation, and the Wyandotte Nation of Oklahoma. No comments were received from tribal governments.

## 5.4 National Trails System Act (NTSA)

The National Trails System Act established the Appalachian Trail as a National Scenic Trail. The MLA provides authority for the Secretary of the Interior or the Secretary of Agriculture to grant easements and rights-of-way upon, over, under, across, or along any component of the national trails system in accordance with the laws applicable to the national park system and national forest system, respectively, provided that any conditions contained in such instruments shall be related to the policy and purposes of the Act.[17] This decision will require compliance with the POD, which itself requires restoration measures to attain existing SIOs within five years after completion of construction and a reduction in width of the long-term ROW. In addition, this decision requires compliance with the POD to implement measures to avoid direct impacts to trail users by boring under the ANST footpath. To ensure consistency with the JNF Forest Plan as amended, the BLM's ROW grant must require implementation of the design features and mitigation measures of the POD that will reduce impacts to ANST users. Therefore, this decision is compliant with the NTSA.

## 5.5 Clean Water Act

The Clean Water Act (CWA) (33 U.S.C. § 1251 et seq.) establishes the basic structure for regulating discharges of pollutants into the Waters of the United States and regulating quality standards for surface waters. Section 404 of the CWA outlines procedures by which the United States Army Corps of Engineers (US ACE) can issue permits for the discharge of dredged or fill material into Waters of the United States, including wetlands. The EPA also independently reviews Section 404 CWA applications and has veto power for permits issued by the US ACE. Mountain Valley is required to comply with permit requirements for CWA Section 401 and 404, as applicable (FERC 2017). The method of crossing streams authorized in this decision is via conventional bore, as disclosed in the 2021 FERC Boring EA. This trenchless crossing method does not result in impacts associated with constructing trenched water crossings directly in waterbodies and wetlands, including increased turbidity and disruption to stream bank and wetland vegetation (FERC 2021 p. 92). No CWA permit is required for actions on NFS lands because there is no proposed action which results in discharge of dredged or fill material into waters of the United States (FSEIS, Appendix F, WET-01).

[17] In the *U.S. Forest Service, et al. v. Cowpasture River Preservation Association, et al.,* 14 S. Ct. 1837 (2020), confirmed that Forest Service retained jurisdiction over NFS lands where the ANST traversed.

Per the CWA, it is unlawful to discharge any pollutant from a point source into navigable waters, unless a permit is obtained. EPA has delegated CWA Section 401 and National Pollution Discharge Elimination System (NPDES) permitting under CWA to State agencies.

For this project, the State agencies are the Virginia Department of Environmental Quality [VDEQ] and the West Virginia Department of Environmental Quality [WVDEP] (FERC 2017). For this project, the USFS is including the following term and condition to be included in the BLM ROW: "Mountain Valley is not authorized to undertake activities related to construction on NFS lands until the company has obtained all Federal and State authorizations outstanding for the entire project." (See Section 2.3 above.) For more information about CWA permits, please see POD Appendices C-1 through C-3 (POD 2022, Table 5-1).

## 5.6 Roadless Area Conservation Rule

The 2001 Roadless Area Conservation Rule (66 FR 3243), hereafter referred to as the 2001 Roadless Rule, prohibits road construction, road reconstruction, and timber harvesting within inventoried roadless areas on NFS lands with limited exceptions. A portion of the MVP project is within the Brush Mountain Inventoried Roadless Area that is subject to the 2001 Roadless Rule. No road construction or reconstruction is proposed on NFS lands for this project. However, timber harvesting has occurred within the right-of-way on NFS lands. Timber harvesting is allowed by the 2001 Roadless Rule that is incidental to the implementation of management activities not otherwise prohibited by the Rule (36 CFR 294.13(b)(2)). Pipeline construction, maintenance, and operation are not prohibited activities under the 2001 Roadless Rule; therefore, this decision complies with the 2001 Roadless Rule.

## 5.7 Endangered Species Act (ESA)

The ESA of 1973 requires Federal agencies to ensure that any agency action does not jeopardize the continued existence of federally threatened or endangered species or adversely modify their designated critical habitat.

Under the Natural Gas Act, the FERC is the "lead agency for the purposes of coordinating all applicable Federal authorizations" associated with this project (15 U.S.C.A. § 717n.). Per that designation, the FERC's consultation on the ESA for the MVP project resulting in the February 28, 2023 Biological Opinion and Incidental Take Statement fulfills Forest Service's need for ESA compliance for the project-specific plan amendment.

The FERC, as lead Federal agency, consulted with the FWS to determine whether any federally listed (or proposed for listing) species, or their designated critical habitats would be affected by the MVP.

Formal consultation with the FWS has been conducted by the FERC, which is the lead Federal agency for the entire 303.5-mile-long MVP project. An updated SBA was prepared in December 2022 (MVP 2022b) in response to the Fourth Circuit's February 3, 2022, vacatur of the 2020 FWS BO and to address changes in the listing status of species and their habitat. To address the vacatur including those species that were determined likely to be adversely affected by the Project, the FWS issued a new BO and Incidental Take Statement for the MVP project on February 28, 2023 (FWS 2023a)[18]. The new BO supersedes the vacated 2020 BO.

As disclosed in the 2023 FSEIS, Sections 1.8 and 3.3.3, the Forest Service reviewed new information and analysis related to Threatened and Endangered Species (TES), including the following changes: Critical

[18] For the broader 303.5-mile-long project, the FERC remains the lead consulting agency which is why the BO will address the MVP as a whole.

Habitat for the candy darter (*Etheostoma osburni*) was designated on April 7, 2021, and became effective on May 7, 2021 (86 FR 17956). The Atlantic pigtoe (*Fusconaia masoni*) was listed as Threatened under the ESA and Critical Habitat was designated on December 16, 2021. On November 29, 2022, the FWS reclassified the northern long-eared bat (*Myotis septentrionalis*) from Threatened to Endangered under the ESA. On September 13, 2022, the FWS proposed to list the tricolored bat (*Perimyotis subflavus*) as Endangered, and a decision is expected September 2023. Running buffalo clover (*Trifolium stoloniferum*) was delisted from the ESA on August 6, 2021.

A total of five ESA-listed species and one species proposed for ESA listing, are analyzed in the 2023 FSEIS (Section 3.3.3) and could be affected by the MVP in the JNF. The Forest Service determined that the MVP may affect or is likely to adversely affect four species: candy darter, Roanoke logperch, Indiana bat, and northern long-eared bat. Formal consultation with the FWS determines appropriate mitigation measures for potential effects to federally listed species. Implementation of required conservation measures in the 2023 FWS BO and POD would help reduce project effects on TES species.

## 5.8 Special Status Species

**Bald and Golden Eagle Protection Act**

Bald and golden eagles are not listed species under the ESA; however, they are protected under the Migratory Bird Treaty Act and the Bald and Golden Eagle Protection Act. Federal protection of bald and golden eagles and their presence in the vicinity of the MVP are discussed in the 2017 FERC FEIS in sections 4.5.1.1 and 4.5.2.6. Although neither species is on the RFSS list, the golden-winged warbler and bald eagle are addressed in the 2017 FERC FEIS Section 4.5.2.6 on Migratory Birds (pp. 4-205 to 4-208) along with mitigation measures. Additionally, Section 6.1.1.2 of the 2022 POD states that Mountain Valley will follow the USFWS Bald Eagle Management Guidelines to reduce disturbance.

**Migratory Bird Treaty Act (MBTA) of 1918 and Executive Order 13186**

The 2017 FERC FEIS discloses that the MVP construction schedule would overlap with the migratory bird nesting seasons (generally between April 15 and August 1). Increased human presence and noise from construction activities could disturb actively nesting birds. Potential impacts to migratory birds and migratory bird habitat would be reduced by implementing "The Migratory Bird Conservation Plan" that was developed with FWS (2017 FERC FEIS, Section 4.5). Section 9.1 of the POD states MVP will comply with operations and maintenance measures in Appendix V of this POD (Plant and Wildlife Conservation Measures Plan) that address migratory birds and other species. Because impacts would be reduced to the extent practicable, this decision is compliant with the MBTA and Executive Order 13186.

## 5.9 Regional Forester Sensitive Species (RFSS)

Federal law and direction applicable to RFSS are included in the NFMA and the Forest Service Manual (2670). Under FSM 2670.44 the Regional Forester is responsible for designating sensitive species for which population viability is a concern. The list of aquatic and terrestrial RFSS considered in the 2022 Supplemental Biological Evaluation (BE) is different from the list in the 2017 BE and 2017 FERC FEIS, because the Region 8 RFSS list is in the process of being revised. Four species are proposed to be added: Tennessee dace (*Chrosomus tennesseensis*), American bumble bee (*Bombus pensylvanicus*), little brown bat (*Myotis lucifugus*), and American ginseng (*Panax quinquefolius*). Ten species are proposed to be removed: Sickle darter (*Percina williamsi*), Appalachia bellytooth (*Gastrodonta fonticula*), highland slitmouth (*Stenotrema altispira*), crossed dome (*Ventridens decussatus*), Rafinesque's big-eared bat (*Corynorhinus rafinesquii*), brown supercoil (*Paravitrea septadens*), delicate vertigo (*Vertigo bollesiana*), cupped vertigo (*Vertigo clappi*), Allegheny cave amphipod (*Stygobromus allegheniensis*), and Avernus cave beetle (*Pseudanophthalmus avernus*).

Three RFSS are analyzed in this 2023 FSEIS (Section 3.3.3) and could be affected by the MVP in the JNF. The Forest Service determined that the Project would have No Impact or would be unlikely to cause a Trend Toward Federal Listing or Loss of Viability for RFSS. Implementation of required conservation measures in the 2023 FWS BO and POD would help reduce project effects on RFSS species.

# 6 Administrative Review

This decision is not subject to either the 36 CFR 218 or 36 CFR 219 pre-decisional administrative review because the responsible official is the Under Secretary of Agriculture, Natural Resources and Environment (36 CFR 218.13(b); 36 CFR 219.51(b)).

# 7 Decision Implementation Date

Upon signature of this Decision:

- The Forest Service adopts portions of the 2017 FERC FEIS that are relevant to NFS lands and the portions of the 2021 FERC Boring EA that are relevant to NFS lands.
- The Under Secretary approves a project-specific amendment that will modify 11 JNF Forest Plan standards and add one standard to the JNF Forest Plan (see Section 2.2 above). This project-specific Forest Plan amendment becomes immediately effective, allowing the MVP project to be consistent with the JNF Forest Plan.
- The Under Secretary concurs with the grant of a ROW, and
- Will provide terms and conditions (see Section 2.3 above) to be included with the Forest Service concurrence for the Project.

# 8 Contact Person

For additional information concerning this decision, contact Joby Timm, JNF Forest Supervisor, by phone at 1-888-603-0261 or by email at SM.FS.GWJNF-PA@usda.gov. You may also visit the Forest Service's website for this project at https://www.fs.usda.gov/project/?project=50036.

May 15, 2023

Dr. HOMER WILKES

Under Secretary

U.S. Department of Agriculture, Natural Resources and Environment